**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JOEL DALE WRIGHT,

      Petitioner,

vs.                                                                                    Case No. 3:09-cv-99-J-32JBT

SEC'Y FLA. DEP'T OF
CORR., et al.,

      Respondents.

_____

## <u>ORDER</u>

### <u>I. Status</u>

Petitioner Joel Dale Wright is a death-sentenced inmate of the Florida penal system who is represented by counsel. He initiated this action by filing a Petition (Doc. #1) for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on February 6, 2009. He is proceeding on an Amended Petition (Doc. #15) and Petitioner's Amended Memorandum of Law in Support of Habeas Corpus Petition (Doc. #17) (hereinafter Petitioner's Memorandum). Petitioner challenges his 1983 state court (Putnam County) judgment of conviction for first degree murder, sexual battery, burglary of a dwelling and second-degree grand theft.

The following grounds are raised in the Amended Petition: (1) Petitioner was deprived of his rights under Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the State failed to disclose material and exculpatory evidence and/or

the State presented misleading evidence and/or defense counsel unreasonably failed to discover and present exculpatory evidence; (2) Petitioner was denied the effective assistance of counsel at the guilt phase of the trial; (3) Petitioner was denied the effective assistance of counsel at the penalty phase of the trial; (4) Petitioner was denied his right to a trial by a fair and impartial jury due to juror misconduct, the trial court's failure to adequately inquire into such misconduct and the trial court's failure to ensure that Petitioner's jury was fair and impartial; (5) the prosecutor's closing argument during the guilt phase denied Petitioner a fair trial; (6) Petitioner was denied an adversarial testing when the jury did not hear that the victim's house had been regularly burglarized; (7) Petitioner was denied the effective assistance of appellate counsel; (8) the Florida Supreme Court failed to comply with the requirements of Sochor v. Florida, 504 U.S. 527 (1992), when it affirmed Petitioner's sentence of death on direct appeal; (9) the trial court violated the Sixth and Fourteenth Amendments to the United States Constitution by restricting Petitioner's right of cross-examination; and (10)  the trial court violated the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution by permitting a police officer to comment upon Petitioner's exercise of his right to remain silent.

Respondents filed a Response to Petition for Writ of Habeas Corpus (Doc. #22). Petitioner replied.  See Reply to State's Response to Amended Petition for Writ of Habeas Corpus and Memorandum of Law in Support of Petition (Doc. #27).

On January 13, 2011, Petitioner's Motion to Interview Jurors (Doc. #28) was filed.  In preparing a response to this motion, Respondents discovered additional pertinent documents that were missing from the record on appeal.  Therefore, they sought and were granted leave

2

to file an Amended Response to Petition for Writ of Habeas Corpus (Doc. #39) (hereinafter

Response[1]), in which they more fully addressed the juror misconduct claim raised in ground

four.  They also filed their Response to Motion to Interview Jurors (Doc. #30).  Petitioner

sought and was granted leave to file a reply to Respondents' Response to Motion to

Interview Jurors.  Petitioner filed Petitioner's Response to Order to Show Cause, Reply to

Response to Motion to Interview Jurors and Reply to Amended Response to Petition for Writ

of Habeas Corpus (Doc. #41).  Thus, this case is now ripe for review.

## II. Procedural History

The Florida Supreme Court summarized the evidence presented at Petitioner's trial

and the trial proceedings as follows:

> The facts reflect that the body of a 75-year-old woman was found in the bedroom of her home on February 6, 1983. The victim was discovered by her brother, who testified that he became concerned when she failed to respond to his knock on the door.  Finding all the doors to her home locked, he entered through an open window at the rear of the house and subsequently found her body.  Medical testimony established that the victim died between the evening of February 5 and the morning of February 6 as a result of multiple stab wounds to the neck and face, and that a vaginal laceration could have contributed to the victim's death.
>
> The state's primary witness, Charles Westberry, testified that shortly after daylight on the morning of February 6, appellant came to Westberry's trailer and confessed to him that he had killed the victim; that appellant told him he entered the victim's house through a back window to take money from her

---

[1] In support of their Response, Respondents have provided the Court with the state court records, which are marked as Exhibit (hereinafter Ex.) A through Ex. Z-7.  See Master Index to Amended Advance Appendix (Doc. #31-1).  Unless otherwise noted, the Court will cite the bates stamped page numbers on the bottom right corner of each page of these Exhibits.

purse and, as appellant wiped his fingerprints off the purse, he saw the victim in the hallway and cut her throat; and that appellant stated he killed the victim because she recognized him and he did not want to go back to prison.  Westberry further stated that appellant counted out approximately $290 he said he had taken from the victim's home and that appellant asked Westberry to tell the police that appellant had spent the night of February 5 at Westberry's trailer.  When Westberry related appellant's confession to his wife several weeks later, she notified the police.  The record also reflects that a sheriff's department fingerprint analyst identified a fingerprint taken from a portable stove located in the victim's bedroom as belonging to appellant, and that, over appellant's objection, the court instructed the jury on the Williams[2] rule and permitted Paul House to testify for the state that approximately one month before the murder, he and appellant had entered the victim's home through the same window that was found open by the victim's brother, and had stolen money.

In his defense, appellant denied involvement in the murder and introduced testimony that, between 5:00 and 6:00 p.m. on February 5, a friend had dropped him off at his parents' home, which neighbored the victim's, and that he left at 8:00 p.m. to attend a party at his employer's house.  Testifying in his own behalf, appellant stated that he returned to his parents' home, where he resided, at approximately 1:00 a.m. on February 6, but was unable to get into the house because his parents had locked him out.  Appellant testified that he then walked by way of Highway 19 to Westberry's trailer, where he spent the night.  Appellant also presented a witness who testified that, late in the night of February 5 and early in the morning of February 6, he had seen a group of three men whom he did not recognize in the general vicinity of the victim's home.

After the close of the evidence but prior to final arguments, appellant proffered the newly discovered testimony of Kathy Waters, who had listened to portions of the trial testimony, followed newspaper accounts of the trial, and

---

[2] In Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847 (1959), the court held that evidence of another crime is admissible when relevant to prove a material issue, unless it is relevant only to show bad character or propensity.

discussed testimony with various persons attending the trial. Her proffered testimony revealed that, shortly after midnight on February 6, she had observed a person, who may have been similar in appearance to appellant, walking along Highway 19, and had also seen three persons, whom she did not recognize, congregated in the general vicinity of the victim's house. The trial court denied appellant's motion to re-open the case, noting that the rule of sequestration is rendered "meaningless" when a witness is permitted "to testify in support of one side or the other, almost as if that testimony were tailor-made," after the witness has conferred with numerous people concerning the case. The jury found appellant guilty as charged.

Appellant, in the penalty phase, presented the testimony of members of his family relating to his character and upbringing, as well as a nine-year-old psychological report which indicated that at that time appellant was depressed, emotionally immature, and had difficulty controlling his impulses.[3] By a nine-to-three vote, the jury recommended that appellant receive the death sentence.

. . . .

In imposing the death sentence, the trial judge found the following four aggravating circumstances: (1) the murder took place after the defendant committed rape and burglary; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) the murder was especially heinous, atrocious, and cruel; (4) the murder was committed in a cold, calculated,

---

[3] At the penalty phase, the State did not call any witnesses. However, the prosecutor presented evidence that, on September 30, 1981, Petitioner was charged with committing a burglary of a dwelling on September 20, 1981. The prosecutor also presented evidence that Petitioner pled guilty to the lesser offense of burglary to a structure and was sentenced to three years of probation on April 29, 1982. Additionally, the prosecutor presented evidence that on August 1, 1974, Petitioner was found to be a delinquent child and committed to the Division of Youth Services based upon a charge that he stole a motor vehicle on April 25, 1974. Finally, the prosecutor presented evidence that on March 4, 1975, Petitioner was found to be a delinquent child and committed to the Division of Youth Services based upon a charge that he stole $44.00 from his mother on February 2, 1975. Ex. A-17 at 2965-71; Ex. A-5 at 833-38.

5

and premeditated manner without any pretense of moral or legal justification.  The trial court found no mitigating circumstances.

Wright v. State, 473 So.2d 1277, 1278-79, 1281 (Fla. 1985) (per curiam).

In his initial brief on direct appeal, Petitioner argued that the trial court erred, and thereby violated Petitioner's rights under the Constitutions of the United States and Florida, by: (1) restricting Petitioner's right of cross-examination; (2) refusing to allow Petitioner to reopen his case to present the testimony of Kathy Waters; (3) instructing the jury to consider evidence of a prior crime committed by Petitioner for the limited purpose of proving the identity of the perpetrator; (4) permitting a witness to comment upon Petitioner's exercise of his right to remain silent; and (5) restricting defense counsel's final argument and/or refusing to instruct the jury on the law governing circumstantial evidence.  Petitioner also challenged his grand theft conviction on the ground that the corpus delicti was not established other than by Petitioner's confession.  Additionally, Petitioner raised the following issues with respect to the sentencing phase of his trial: (1) the trial court erred in finding that the murder was committed for the purpose of preventing a lawful arrest; (2) the trial court erred in finding that the murder was cold, calculated, and premeditated; (3) section 921.141, Florida Statutes (1983), violates the federal constitution by depriving the Petitioner of his right to a trial by his peers; and (4) Florida's capital sentencing statute is unconstitutional on its face and as applied.  See Ex. B.  Thereafter, Petitioner sought, and was granted, leave to raise the following additional issue on appeal: the trial court erred and violated Petitioner's constitutional rights by conducting an inquiry into juror bias outside the presence and without the knowledge of Petitioner.  Ex. D-1; Ex. D-2; Ex. D-4; Ex. D-5.

6

On July 3, 1985, the Florida Supreme Court affirmed Petitioner's conviction and death sentence.  Wright, 473 So.2d at 1282; Ex. E.  Petitioner filed a motion for rehearing, see Ex. E-2, which was denied on August 30, 1985.  Ex. E-4.

Petitioner filed a petition for writ of certiorari to the United States Supreme Court, presenting the following issues: (1) whether violation of the Sixth Amendment right to present non-cumulative, relevant testimony of a witness who is competent, present and willing to testify at trial can ever be deemed harmless error in a capital trial and, if so, whether such a violation can reasonably be deemed harmless where the testimony improperly excluded from the jury bore directly on the credibility of the defendant in a case where credibility of the defendant was the critical issue; and (2) the two-tiered procedure used to impose the death sentence in Florida violates the Sixth and Fourteenth Amendments, where factual/guilt findings used to impose the death sentence are made wholly by the trial judge, as opposed to the jury.  Ex. F.  The petition for writ of certiorari was denied on January 21, 1986.  Wright v. Florida, 474 U.S. 1094 (1986); Ex. F-3.

On July 19, 1988, Petitioner filed an amended motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850 (hereinafter 3.850 motion).  He raised the following grounds: (1) the State withheld exculpatory evidence from the defense; (2) Petitioner was denied the effective assistance of counsel at both the guilt and penalty phases of trial; (3) Petitioner was denied the effective assistance of counsel at sentencing for counsel's failure to produce evidence that Petitioner was not antisocial, violent or sociopathic and that he did not have the mental make-up to have committed the offense; (4) Petitioner was denied his right to a trial by a fair and impartial jury due to trial counsel's failure to request a change of

7

venue and the trial court's failure to adequately conduct voir dire; (5) Petitioner was denied his right to a trial by a fair and impartial jury due to improper juror conduct and the trial court's failure to adequately inquire into such conduct; (6) Petitioner's conviction and death sentence are invalid because the State presented evidence that violated Petitioner's right to remain silent; (7) Petitioner was denied his right to confront a witness through cross-examination; (8) Petitioner's constitutional rights were violated when the trial court refused to permit the defense to reopen its case to present newly discovered evidence; (9) Petitioner was denied his constitutional right to present a defense when counsel was not permitted to present exculpatory evidence that the victim's house was regularly burglarized; (10) the prosecutor's closing argument at the guilt phase denied Petitioner a fair trial; (11) defense counsel failed to request, and the court erred by not giving, a jury instruction regarding voluntary intoxication and specific intent; (12) Petitioner's constitutional rights were violated due to his absence from the courtroom while the court communicated with jurors during the guilt/innocence phase of trial; (13) the trial court's jury instructions unconstitutionally shifted the burden of proof; (14) the jury instructions misled the jurors and diluted their sense of responsibility for sentencing; (15) the jury was misled and incorrectly informed of its function at a capital sentencing proceeding; (16) the heinous, atrocious and cruel aggravating factor was unconstitutionally applied; (17) non-statutory aggravating factors were introduced; and (18) the jury instructions at the penalty phase erroneously set forth the law as to what aggravating factors could be considered.  Ex. G-1 at 1-153.

After conducting an  evidentiary hearing, the circuit court entered an order denying the 3.850 motion. Ex. G-6 at 1084-92.  Thereafter, Petitioner filed a motion for rehearing and

8

a motion to amend, in which he sought to raise the additional claim that Petitioner's trial

defense attorney, Howard Pearl, labored under a conflict of interest in representing Petitioner

due to Mr. Pearl's position as a special deputy sheriff.  Ex. G-7 at 1167-94.  The court denied

the motion by adopting the findings of another judge who had held a hearing on the same

issue in a case where Mr. Pearl represented another defendant.  Ex. G-8 at 1385-86.

Petitioner appealed the denial of the 3.850 motion to the Florida Supreme Court, Ex.

H, and that court found that "the trial court properly denied relief on each of the claims made

in Wright's initial rule 3.850 motion."  Wright v. State, 581 So.2d 882, 886 (Fla. 1991) (per

curiam); Ex. K.  However, the court reversed and "remand[ed] for an evidentiary hearing on

whether Wright's public defender's service as a special deputy sheriff affected his ability to

provide effective legal assistance."  Id. 887.  Thereafter:

> [the Florida Supreme Court] granted Wright permission to consolidate his claim with the claims of other defendants who also argued that Assistant Public Defender Howard Pearl's status as a special deputy sheriff affected his ability to provide effective legal assistance.  These claims were dubbed the "Pearl" claim, and heard in December 1992 by Judge B. J. Driver.
>
> Prior to the December 1992 hearing, Wright again amended his postconviction motion based on documents provided by the Putnam County Sheriff's Department after a public records request under chapter 119, Florida Statutes. Judge Driver severed Wright's new claims from the Pearl claim because Judge Driver was appointed to hear only the Pearl claim, and these new claims were outside the scope of his appointment.  Judge Driver denied relief on the Pearl claim, finding that Assistant Public Defender Howard Pearl's status as a special deputy sheriff did not affect his ability to provide effective legal assistance.  During the postconviction hearing on the Pearl claim, Judge Robert Perry, who presided over Wright's trial, testified.  Wright alleges he learned that Judge Perry also

9

had special deputy appointments in Duval, Volusia, and Orange Counties, but Judge Perry testified that he did not recall whether he had a special deputy appointment in Putnam County, where Wright was tried.

After Judge Driver denied relief on the Pearl claim, Wright sought a hearing on the claims raised in the supplemental 3.850 motions which had been severed from the Pearl claim. The case was reassigned and an evidentiary hearing was held in March 1997, which was continued and completed in December 1997. In addition to the issues heard, the trial court reconsidered Wright's Pearl claim based on this Court's decision in Teffeteller v. Dugger, 676 So.2d 369 (Fla. 1996), which held that the December 1992 consolidated hearing violated due process.

Wright v. State, 857 So.2d 861, 866-67 (Fla. 2003) (per curiam).

Thereafter, the trial court denied relief on the conflict of interest claim and the claims raised in the supplemental 3.850 motions (hereinafter second 3.850 motion[4]) . Ex. N-6 at 1137-40. Petitioner appealed, raising the following issues:

(1) in the first postconviction proceeding in 1988, the trial court made false findings of certain facts and [the Florida Supreme] Court erroneously adopted those false facts on appeal, the State failed to disclose exculpatory evidence as required under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and there was newly discovered evidence of innocence admissible under Jones v. State, 591 So.2d 911 (Fla. 1991); (2) Wright's appointed trial counsel, Howard Pearl, and Pearl's investigator, Freddie Williams, were bonded deputy sheriffs, a status which interfered with their ability to provide effective assistance of counsel; (3) the trial judge, Robert Perry, failed to reveal at the time of trial and at the time he presided over Wright's first postconviction proceeding that he was a special deputy sheriff, which would have warranted disqualification; (4) Judge Perry's standard practice was to request the State to draft

_____

[4] In the appeal of this order, the Florida Supreme Court refers to the supplemental 3.850 motions as Petitioner's second post-conviction motion; therefore, this Court will do the same.

> sentencing orders in capital cases which constitutes reversible error; and (5) Judge A. W. Nichols, III, who presided over Wright's second postconviction proceeding, refused to timely rule on his motion for postconviction relief, the State delayed disclosure of exculpatory materials, and both acts amount to a denial of due process.

Wright, 857 So.2d at 867.

Petitioner also filed a petition for writ of habeas corpus with the Florida Supreme Court, raising the following issues:

> (1) the State failed to disclose pertinent facts necessary for [the Florida Supreme] Court's consideration; (2) appellate counsel failed to raise numerous meritorious issues on appeal; (3) the presiding judge unconstitutionally made factual findings in support of Wright's death sentence in violation of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (4) [the Florida Supreme] Court failed to make an appropriate harmless error analysis after striking an aggravating circumstance on direct appeal, in violation of Sochor v. Florida, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992).

Id. at 874.

On July 3, 2003, the Florida Supreme Court affirmed the trial court's order denying the second 3.850 motion and denied the petition for writ of habeas corpus. Id. at 868-79; Ex. U. Rehearing was denied on October 10, 2003. Ex. U-5. Petitioner filed a petition for writ of certiorari, see Ex. V, which was denied on February 24, 2004. Wright v. Crosby, 541 U.S. 961 (2004); Ex. X.

On August 11, 2003, Petitioner filed a motion for DNA testing pursuant to Fla. R. Crim. P. 3.853. Ex. Y-1 at 1-6. The motion was granted, see Ex. Y-2 at 234-36, and the DNA from sperm recovered from the vagina and anus of the victim matched the DNA of the Petitioner.

11

Id. at 295-300.  DNA testing on hairs found on the victim did not match Petitioner.  Id. at 234-35.[5]

Petitioner filed a third motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.851 (hereinafter 3.851 motion) on August 5, 2004.  Ex. Y-4 at 4-39.  He raised the following issues: (1) his constitutional rights were violated when the State failed to disclose exculpatory evidence, the State presented misleading evidence, defense counsel unreasonably failed to discover and present exculpatory evidence, and the prosecutor violated Giglio[6]; and (2) due to improvements in DNA testing, newly discovered evidence is available to prove Petitioner's innocence, and to the extent that the State has destroyed biological evidence, Petitioner's due process rights have been violated.  Id.

The trial court denied the motion, see Ex. Y-2 at 310-12.  Petitioner appealed, and on November 20, 2008, the Florida Supreme Court affirmed the trial court's order.  Wright v. State, 995 So.2d 324 (Fla. 2008) (per curiam); Ex. Z-3.  Rehearing was denied on November 20, 2008, see Ex. Z-6, and the mandate was issued December 8, 2008.  Ex. Z-7.  This action was timely filed in this Court.  See 28 U.S.C. 2244(d)(1).[7]

---

[5] Petitioner objects to the State's reliance on the DNA evidence mostly because the DNA results were "untested."  Because the DNA issue is not raised in this federal habeas proceeding, the Court does not rely on this evidence or further address it.

[6] Giglio v. United States, 405 U.S. 150 (1972).

[7] Respondents concede that the initial Petition (Doc. #1) was timely filed; however, they contend that the Amended Petition was not timely.  See Response at 9-12.  This Court is of the opinion that the Amended Petition was timely filed because the claims raised therein relate back to the initial Petition.

### III. Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The pertinent facts of this case, contained in the extensive state court record and the record of the evidentiary hearing on post-conviction motion conducted by the state court, are fully developed in the record before the Court. Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004), an evidentiary hearing will not be conducted.

### IV.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA), this Court's review "is 'greatly circumscribed and highly deferential to the state courts.' Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002)." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).

> [Section] 2254(d) allows federal habeas relief for a claim adjudicated on the merits in state court only if the state court adjudication[8] resulted in a decision that was: "(1) . . . contrary

---

[8] "[T]he highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision." Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008), cert. denied, 129 S.Ct. 1336 (2009). In this case, the Florida Supreme Court was the highest state court to adjudicate Petitioner's claims on the merits.

to, or involved an unreasonable[9] application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Marquard, 429 F.3d at 1303.  The phrase "clearly established Federal law," as used in § 2254(d)(1), encompasses only the holdings, as opposed to the dicta, of the United States Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. —, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)); Osborne v. Terry, 466 F.3d 1298, 1305 (11th Cir. 2006).

Id. at 1208-09.

        For a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling.

        By its terms § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).  There is no text in the statute requiring a statement of reasons.  The statute refers only to a "decision," which resulted from an "adjudication."  As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.

_____

        9 "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. at 473 (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)).

14

Harrington v. Richter, 131 S.Ct. 770, 785 (2011); see also Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002), cert. denied, 538 U.S. 906 (2003).

"AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' § 2254(e)(1)." Schriro, 550 U.S. at 473-74. This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

## V. Ineffective Assistance of Counsel

Petitioner raises numerous ineffective assistance of trial and appellate counsel claims. "To prevail on th[ese] claim[s], [Petitioner] must meet both the deficient performance and prejudice prongs of Strickland." Wong v. Belmontes, 130 S.Ct. 383, 384 (2009) (per curiam) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption"[10] that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel'

---

[10] As noted by the Eleventh Circuit, a court begins "with the 'strong presumption' that counsel's conduct was reasonable, Strickland, 104 S.Ct. at 2065; and that presumption is even stronger when we examine the performance of experienced counsel. Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc)." Walls v. Buss, 658 F.3d 1274, 1279 (11th Cir. 2011) (per curiam). The record reflects that Mr. Pearl had handled approximately fifty capital cases at the time he represented Petitioner. See Ex. G-5 at 871.

guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S.Ct. 2052.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

Harrington v. Richter, 131 S.Ct. at 787-88. Since both prongs of the two-part ineffectiveness test under Strickland must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir.) (citation omitted), cert. denied, 131 S.Ct. 647 (2010).

"In considering claims that counsel was ineffective at the penalty phase of trial, [the Court must] determine 'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" Stewart, 476 F.3d at 1209 (quoting Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir. 2006)); see also Porter v. McCollum, 130 S.Ct. 447, 452 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background'") (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000)). With respect to the prejudice prong, Petitioner "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, we consider 'the totality of

16

the available mitigation evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding' - and 'reweig[h] it against the evidence in aggravation.'" Porter, 130 S.Ct. at 453-54 (quoting Williams, 529 U.S. at 397-398); see also Sears v. Upton, 130 S.Ct. 3259, 3267 (2010) (finding that a proper prejudice analysis must take into account the newly uncovered mitigating evidence, along with the mitigation evidence introduced during the defendant's penalty phase trial, to assess whether there is a reasonable probability that the defendant "would have received a different sentence after a constitutionally sufficient mitigation investigation") (citations omitted).

"A [petitioner] can establish ineffective assistance of appellate counsel by showing: (1) appellate counsel's performance was deficient, and (2) but for counsel's deficient performance he would have prevailed on appeal." Shere v. Sec'y, Dep't of Corr., 537 F.3d 1304, 1310 (11th Cir. 2008) (citations omitted).

> The Supreme Court has held a criminal defendant's appellate counsel is not required to raise all nonfrivolous issues on appeal. Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308, 3312-14, 77 L.Ed.2d 987 (1983). In so holding, the Court noted, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751-52, 103 S.Ct. at 3313. Therefore, it is difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues. Smith v. Robbins, 528 U.S. 259, 287-88, 120 S.Ct. 746, 765-66, 145 L.Ed.2d 756 (2000).

Payne v. United States, 566 F.3d 1276, 1277 (11th Cir. 2009) (per curiam).

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> The question "is not whether a federal court believes the
> state court's determination" under the Strickland standard "was
> incorrect but whether that determination was unreasonable - a
> substantially higher threshold." Schriro, supra, at 473, 127 S.Ct.
> 1933.   And, because the Strickland standard is a general
> standard, a state court has even more latitude to reasonably
> determine that a defendant has not satisfied that standard. See
> Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158
> L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was
> unreasonable requires considering the rule's specificity. The
> more general the rule, the more leeway courts have in reaching
> outcomes in case-by-case determinations").

Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).   Thus, the standards created by

Strickland and § 2254(d) are both highly deferential, "and when the two apply in tandem,

review is 'doubly' so[.]"   Harrington, 131 S.Ct. at 788 (quoting Knowles, 129 S.Ct. at 1420).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

Petitioner contends that he was deprived of his rights under Fifth, Sixth, Eighth and

Fourteenth Amendments to the United States Constitution because the State failed to

disclose material and exculpatory evidence and/or the State presented misleading evidence

and/or defense counsel unreasonably failed to discover and present exculpatory evidence.

Amended Petition at 7-67; Petitioner's Memorandum at 17-43.

### 1.  The Portions of this Claim Raised in the First 3.850 Motion

In his first claim under this ground, Petitioner asserts that "[t]he jury never heard the

considerable and compelling evidence that two individuals, Clayton Strickland and Henry

Jackson, either separately or together killed Lima Paige Smith."   Amended Petition at 8.

18

Petitioner raised this claim in first 3.850 motion.  Specifically, in his 3.850 motion, Petitioner argued that the State failed to reveal information about other possible witnesses who would have testified to exculpatory matters.  Ex. G-1 at 12-15.

The first witness he identified was Kimberly Holt.  On February 28, 1983, in a written statement, she answered the following questions posed by Detective Taylor Douglas.

> Q.    The Putnam County Sheriff's Office is conducting an investigation into the stabbing death of Lima Paige Smith.  Do you have any information in this investigation that would be helpful?
>
> A.    Yes, sir, it may be helpful.  I was employed at Miller's Supermarket located at Westgate Shopping Center, from Oct 1982 through Feb 1, 1983.  I was a cashier.  On Feb 6, 1983 I was working the 3 to 10 PM shift.  A man came through my check-out line with fresh scratch marks on his face.  He is in the store a lot [sic] but I don't know his name.  He always pays with food stamps or bottles.  The man was in line and when it got his turn to check out, he said, "How you doing good look'in [sic]".  I [k]inda [sic] ignored him.  [He] bought two cases of beer, Old Milkawuee [sic], and paid with it with a One Hundred Dollar Bill.  He took it out of his wallet and I could see another One Hundred Dollar bill in his wallet.  He said "I got money today."  Then he asked me if I knew that Mrs. Smith was dead?  I said pardon me?  Then he said "Did you know Ms. Smith was dead?"  I said "That is terrible, I can't believe that anyone would kill a beautiful woman like that."  He asked me what time I got off of work.  I told him that I got off at 7 o'clock in the morning when I actually got off at 10PM.  I tol[d] him that because I  was scared of him.  Then he left.
>
> Q.    What time was this man in the store?
>
> A.    At 4:30 PM.  I remember because I looked at the clock when he was checking out.

> Q.    Is that man that you identified in the white male "mug" book, the same individual you stated that had the scratch marks on his face.  (The person identified is Henry Jackson.)[11]
>
> A.    Yes it is.
>
> Q.    Is there anything else you want to add or change in this statement?
>
> A.    Just that the scratch marks were still b[l]eeding and his shirt was torn.

Ex. G-1 at 166.

The next witness Petitioner identified was Wanda Brown.  On February 7, 1983, she

provided a statement to Detective Taylor Douglas, which states:

> My occupation is a substitute mail carrier on Rural Route 5, which includes Third Avenue on which Ms. Lima Paige Smith resided.
>
> On Saturday, February 5, 1983 while in the process of delivering mail I turned right off of Florida Avenue onto Third Avenue and proceeded west towards Highway 19.  I first observed Ms. Smith inside of her fence line motioning with her hand to a white male subject to move on towards an easterly direction on Third Avenue.  At this time the male subject shook his arm at Ms. Smith and walked towards the middle of the road in front of my vehicle.  I stopped and he walked up to the side of

_____

[11] In a February 10, 1983 voluntary statement to Detective Douglas, Jackson said that Ms. Smith's brother told him about Ms. Smith's rape and murder when Jackson and Strickland were walking by her house on the way to the market.  Ex. G-2 at 377.  When Detective Douglas asked Jackson how the scratch marks on his face had been inflicted, Jackson replied, "I was down at my sister's house on ala. ave [sic] and there was a man there visiting my sister. . . . He had been drinking and he jumped on me and scratched me in the face.  So we got into a fight.  Then I left and went up to Miller[']s [Supermarket].  That was on Sunday night."  Id. at 378.  Jackson stated that he was with Strickland on the pertinent Saturday night and Sunday morning (February 5th and 6th, 1983).  Id.  Strickland's February 10, 1983 voluntary statement to Detective Douglas corroborated Jackson's statement.  Id. at 379-80.

> my Jeep.  At this time I realized he was intoxicated.  He asked me why there was usually a man mail carrier but today it was a woman.  I then asked him what he wanted and he asked if I had his check.  I then asked who he was and he replied "Strickland, I live with Henry Jackson["] (Henry Jackson lives at Rt. 5 Box 184 Oakwood Ave.)  I then told him I had no mail for that box.  He then replied "I need my check, I need some money.  Have you got some money I can have?"  I then became scared and drove away.  When I last saw him he was walking east on Third Avenue.  Ms. Smith was still standing in her yard watching this take place.

Id. at 171 (some capitalization omitted).

The next witness Petitioner identified was Charlene Luce.  On February 9, 1983, she provided a statement to Detective Douglas, which states in pertinent part:

> Friday afternoon about 3:30 to 4:00 . . . I was in the yard picking up sticks.  Jackson and Strickland were arguing about clothes and money.  Then Strickland called me to the fence ask [sic] me to put some meat in my freezer.  I said no.  I was afraid that Henry would be mad if his meat was gone.  Then, Strickland started talking about he didn't like anyone missing [sic] with his clothes. . . .  Then talked about he wasn't scared of Leroy or Henry they may kill me but I'm not scared of anyone.  I walk away.  Strickland still fussing about his clothes.  Jackson throw blue trunks outside on the ground.  Jackson went back into the trailer.  By this time I was near the fence again.  Jackson came back to the door with a knife in right hand.  He was very upset.  I yell at him to clam [sic] down and take a deep breath. . . .  Strickland wal[ked] fast to the back of the trailer.  Knife blade was short.  Didn't see knife handle.  Then Jackson walked closer to the fence talking about he was a white man and always will be. . . .  Jackson told me that Strickland had his money and he wanted it.  I walked away and went inside.
>
> Sunday about 4:30 or 5:00 [in the] afternoon I went outside to get something out of the freezer when Jackson called me to the fence to tell me that Miss Smith was kill [sic].  Then I asked Jackson if he did it.  He turn [sic] red in the face and turned away.  I'm just joking.  Strickland was talking didn't understand what was said.  Then Jackson told that Miss Smith

21

> gave him the best Christmas gift a box of candy.  Mr. Smith gave him a carton of cig.  He talk about cutting some trees down for Miss Smith.  I could believe [sic] that Miss Smith was dead.  Why her?  Jackson said that Miss Smith told him that she didn't kept [sic] money at home.
>
> Oh, the knife was more like a pocket knife.  Also, Jackson was the only one with knife when had argument on Friday.

Id. at 173-74.

In his 3.850 motion, Petitioner argued that the prosecution suppressed these statements in violation of Brady v. Maryland, 373 U.S. 83 (1967).  Ex. G-1 at 18.  He also stated that "the defense and Mr. Pearl specifically knew nothing of these matters, however, if he knew, his failure to use these exculpatory matters was clearly ineffective."  Id. at 19.

After conducting an evidentiary hearing on this issue in October of 1988, the circuit adjudicated this claim as follows:

> The investigator for the Public Defender's Office, Mr. Freddie Williams, testified that he was aware of the statements by Brown[12] and Luce [13].  An excerpt is attached hereto as Exhibit "6".  Mr. Williams and defense counsel worked closely together

---

[12]  At the evidentiary hearing, Mr. Williams was shown the three statements at issue and testified as follows with respect to Brown's statement.  "Wanda Brown.  I never saw that statement before, except one day I was discussing this case in the State Attorney's Office and they showed it to me then."  Ex. G-6 at 979-80.  However, he later clarified that he first saw Brown's statement when he was in the State Attorney's Office sometime during the week before the October, 1988 evidentiary hearing.  Id. at 994.  Thus, the trial court erroneously found that Mr. Williams was aware of Brown's statement prior to trial.  This erroneous finding does not affect the ultimate conclusion by the Florida Supreme Court that Petitioner's Brady claim was properly denied.

[13]  With respect to Luce's statement, Mr. Williams testified, "I've read this statement[.]" Ex. G-6 at 980.  However, later in his testimony, he stated that he had not seen Luce's statement.  Id. at 994.  Nevertheless, he was fairly certain that he had interviewed her prior to trial, and he remembered the reference to the box of Christmas candy.  Id. at 980, 989.

and it is likely that defense counsel was made aware of the statements through Mr. Williams. Additionally, defense counsel testified that he knew of the incident involving Ms. Holt and, in fact, had interviewed her with Mr. Williams but that he had never seen the statement given by Ms. Holt to the authorities.[14] An excerpt is attached hereto as Exhibit "7". Whether the statements were exculpatory in nature is highly speculative and, thus, the claim is legally insufficient to support a claim under Brady. Gorham v. State, 521 So.2d 1067 (Fla. 1988).

Ex. G-6 at 1085-86. Upon Petitioner's appeal, the Florida Supreme Court quoted the trial court's order denying the 3.850 motion, and found "that the trial court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion." Wright, 581 So.2d at 886.[15]

Because there is a qualifying decision from the Florida Supreme Court, this Court must next consider the "contrary to" and "unreasonable application" components of the statute. "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide." Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).

---

[14] Mr. Pearl testified at the evidentiary hearing that, although he did not recall receiving Ms. Holt's statement in discovery, he and Mr. Williams had interviewed Ms. Holt and she told them "the same things . . . that she related in the statement." Ex. G-5 at 793. He testified that he never saw the statements of Ms. Brown and Ms. Luce until they were shown to him at the October, 1988 evidentiary hearing. However, it was possible that he saw Ms. Holt's statement at some point after he and Mr. Williams interviewed her, but prior to Petitioner's trial. Id. at 808.

[15] Petitioner also raised this issue in his second 3.850 motion, see Ex. N-1 at 186-88, and on appeal of the order denying his second 3.850 motion. However, the Florida Supreme Court declined to address it, finding it successive and procedurally barred. See Wright, 857 So.2d at 868 ("We will not entertain a second appeal of claims that were raised, or should have been raised, in a prior postconviction proceeding.").

"Under Brady, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." Smith v. Cain, 132 S.Ct. 627, 630 (2012) (citing Brady, 373 U.S. at 87).

> We have explained that "evidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469–470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted).

Id.

> In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the Supreme Court enunciated the now well-established principle that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The duty to disclose exculpatory evidence is applicable even in the absence of a request by the defendant, and it encompasses impeachment material as well as exculpatory evidence. See Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). . . . The Supreme Court has condensed these basic principles into three components, each of which is necessary to establish a Brady violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler, 527 U.S. at 281-82, 119 S.Ct. at 1948.

Maharaj v. Sec'y, Dep't of Corr., 432 F.3d 1292, 1309 (11th Cir. 2005).

24

The undersigned has reviewed in detail the transcript of the evidentiary hearing conducted by the state court on the Brady issue, at which all the relevant players testified. See Ex. G-4 at 716-78; Ex. G-5 at 784-825, 829-78, 893-904, 906-29, 933-69; Ex. G-6 at 975-94, 1057-80.   Because of the passage of time (the evidentiary hearing was held approximately five years after the trial) many of the witnesses struggled to recall the events clearly.   However, based on this testimony, it is certainly possible that Petitioner's trial counsel (or at least Petitioner's trial investigator) did have pretrial access to these statements. Moreover, through their own investigation, Petitioner's defense team replicated much (but not all) of the information contained in the statements.   Finally, whether there is a "reasonable probability" that access to these statements would have made a difference is a judgment call, which the state courts have made.

While this Court acknowledges that Petitioner, through his post-conviction counsel, has set forth an arguable Brady claim, see e.g., Petitioner's Reply at 13-22, even if this Court were to decide the Brady issue unfettered, there is not enough shown to grant relief.  When the layer of AEDPA deference that this Court must give to the decisions of the trial court and the Florida Supreme Court is factored in, this Court's decision to deny habeas relief is solidified.[16]   Nevertheless, the Court will grant a certificate of appealability on the Brady issue.

---

[16] Neither the trial court nor the Florida Supreme Court specifically addressed Petitioner's claim that defense counsel was ineffective for failing to discover and/or present the testimony of Holt, Brown and Luce.  There is insufficient record support for this claim.  See Ex. G-5 at 893, 955-68; Ex. G-6 at 981-88, 991, 993-94, 1060-61.

25

The next evidence that Petitioner identifies in support of this claim is the testimony of William Bartley at the October, 1988 evidentiary hearing on Petitioner's first 3.850 motion. Amended Petition at 13-15.  Bartley testified that he lived in the same neighborhood as Strickland, Jackson and the victim.  Ex. G-6 at 1005.  He observed Strickland and Jackson drinking in an empty lot next to the victim's house the night before her body was discovered. Id. at 1007-08.  He frequently saw the two men in that location.  Id. at 1007.

Although this testimony was presented at the 1988 evidentiary hearing on Petitioner's first 3.850 motion, Petitioner did not identify this information in his first 3.850 motion and did not allege in the motion that this information was suppressed by the State.  To the extent that Petitioner may be alleging here that this information was suppressed, the claim is without merit because Bartley testified at the hearing that, prior to trial, he never told the police or anyone else that he saw Strickland and Jackson drinking in an empty lot next to the victim's house the night before her body was discovered.  Id. at 1011, 1015.  Thus, the State could not have suppressed such information because they did not possess it.  To the extent that Petitioner may be claiming counsel was ineffective for failing to discover and present this evidence, the Court finds this claim to be without merit because there is no reasonable probability that, had this information been presented to the jury, the outcome of the trial would have been different.

Next, Petitioner contends that the State failed to disclose that Westberry had been engaged in an illegal scrap metal business, for which he feared prosecution,[17] and that he

---

[17] At the evidentiary hearing, Westberry agreed that he was "scared of getting into trouble for" the illegal scrap metal business.  Ex. G-4 at 645.

received a limited grant of immunity from prosecution for such illegal activities.  Amended

Petition at 33-41.  Petitioner also alleges that the prosecution failed to give the defense the

prosecutor's written summary of Westberry's proposed testimony.  Id. at 41-49.  Petitioner

raised these claims in his first 3.850 motion, and the trial court adjudicated the claims as

follows:

> Defendant alleges in Claim I, Subpart A, that the State withheld exculpatory material in violation of Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide the defense with an alleged "script" supplied to the State's key witness, Charles Westberry.  Brady material is evidence favorable to an accused and suppressed by the State.  The so-called script furnished to Westberry would not tend to exonerate the Defendant.  Both the former prosecutor and Westberry testified at the evidentiary hearing that the document contained a summary of Westberry's prior statements, in Westberry's own words.  Excerpts from both Westberry's and the former prosecutor's testimony are attached hereto as Exhibit "3"[[18]].  As such, the so-called script is not Brady material and the Defendant's claim does not warrant relief.
>
> Claim I, Subpart B, alleges that the State entered into a secret contract of immunity with Westberry.  At the evidentiary hearing, Westberry specifically denied entering into a secret deal with the State.[[19]]  An excerpt is attached hereto as Exhibit "4".  According to the former prosecutor, there was a contract of immunity entered into on July 19, 1983 with Westberry but the defense counsel fully cross-examined Westberry about the immunity contract at trial.[[20]]  Consequently, the jury was aware

_____

[18] See Ex. G-4 at 689, 757-58.

[19] See Ex. G-4 at 653, 689.

[20] Charles Westberry was charged with being an accessory after the fact to Petitioner's murder of Ms. Smith.  The record reflects that the State entered into a plea agreement with Charles Westberry, whereby he agreed to testify truthfully at Petitioner's trial in return for the State's permitting him to plead guilty to the lesser offense of compounding a felony.  Ex. A-5

> of this deal and able to believe or disbelieve the witness.  An
> excerpt from the record pages 2162-2166 is attached hereto as
> Exhibit "5".

Ex. G-6 at 1084-85.

Upon Petitioner's appeal, the Florida Supreme Court quoted the trial court's order

denying the 3.850 motion and found:

> the trial court properly denied relief on each of the claims made
> in Wright's initial rule 3.850 motion.  With regard to the claim that
> the witness Westberry had made a secret contract of immunity
> with the state, we note that Westberry testified at the evidentiary
> hearing that the state attorney never promised him that he would
> not be prosecuted on the scrap metal thefts. Moreover, the
> prosecutor testified that he found out about the scrap metal
> thefts after he had given Westberry immunity on the murder.[21]
> Further, this record reflects that defense counsel was aware of

---

at 832; Ex. A-14 at 2161-63.   Charles Westberry was also granted immunity from
prosecution for having entered the residence of Lima Paige Smith prior to February 5, 1983.
Ex. A-14 at 2166, 2202.  Petitioner asserts that, during the evidentiary hearing on his 3.850
motion, the prosecutor admitted that there was also a grant of immunity from prosecution
for the illegal scrap metal business.  However, upon review of the prosecutor's testimony,
it is clear that he did not make such an admission.  Ex. G-4 at 747-56.  Instead, he testified
that "the grant of immunity was limited to matters referring to the breaking and entering of
the residence of Lima Paige Smith, and no other crimes or criminal acts."  Id. at 753.  The
prosecutor testified that he told Westberry it was "extremely doubtful" that he would be
prosecuted for the illegal scrap metal business, "but if the Sheriff's Office did develop
information that would give [them] probable cause where [they] could file he may well be
charged with it."  Id. at 752.

[21] See Ex. G-4 at 753.  The prosecutor actually testified that he learned of the illegal scrap
metal business after Westberry was given immunity from prosecution for entering the victim's
house prior to February 5, 1983.  There is no indication in the record that Westberry was
given immunity for the murder.  However, this erroneous factual finding does not affect the
Florida Supreme Court's correct conclusion that there was no Brady violation because there
was no secret grant of immunity from prosecution for the illegal scrap metal business.

28

the scrap metal thefts[22] and, in fact, proffered testimony at trial regarding this activity.[23]  On the basis of this record, we find that the trial judge properly denied relief on this claim.

Wright, 581 So.2d at 886.

After a thorough review of the record and the applicable law, this Court concludes that the state court's adjudication of this portion of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Petitioner is not entitled to relief on this portion of his claim.

### 2.  The Portions of this Claim Raised in the Second 3.850 Motion

Next, Petitioner claims that the following additional evidence was suppressed by the State: (1) Leon Wells's statement that Jackson was fond of knives and was violent, and a police report concerning Wells's observation of Jackson's violent behavior, Amended Petition at 53-54; (2) a police report wherein Glenna Fox reported that she saw Jackson attempting to enter her home, id. at 54-55; (3) Ella Hill's complaints to the police about Jackson's violent behavior, id. at 55-57; (4) a 1984 police report wherein Grace Moore reported that, after she had hired Jackson to work in her yard, she was awakened by him the next day with a bump

---

22 At the evidentiary hearing on Petitioner's first 3.850 motion, Mr. Pearl testified that he was aware, prior to trial, that Charles Westberry was engaged in an illegal scrap metal business; however, he was never informed that Westberry was granted immunity for such illegal activity.  Ex. G-5 at 791.  Of course, as stated above, the record does not reflect that there was such a grant of immunity.

23 See Ex. A-14 at 2184-85.

on her head and the money that was in her pantyhose missing, id. at 57; (5) a police report concerning Dell Gilman's allegation that Officer Walter Perkins falsified a police report; (6) the fact that Petitioner's fingerprints had been obtained on February 11, 1983, but no comparison to the fingerprints at the crime scene was made until after Officer Walter Perkins assisted in Petitioner's arrest on April 19, 1983, id. at 57-58; (7) police reports regarding Bobby Hackney, which demonstrated that, despite his criminal history, he was not adequately investigated as a suspect, id. at 58-59; (8) the statements of Wanda Brown, Kim Holt and Charlene Luce; id. at 51-53, 59; (9) William Bartley's statement that he observed Jackson and Strickland in an empty lot next to the victim's home near the time of the murder, id. at 59; (10) Henry Jackson's criminal history; id.; and (11) the fact that the prosecutor in Petitioner's case previously represented Jackson in a criminal proceeding.  Id.

Petitioner raised this portion of his claim in his second 3.850 motion. Ex. N-1 at 125-40; Ex. N-5 at 914-33.  The trial court denied this claim, finding that it was procedurally barred.  In the alternative, the court found the claim to be speculative and further found that there was no evidence that the outcome of Petitioner's trial would have been different had the evidence been disclosed.  Ex. N-6 at 1137-38.

Petitioner appealed, see Ex. O at 53-78, and the Florida Supreme Court adjudicated this claim[24] as follows:

---

[24] In the appeal of the order denying his second 3.850 motion, Petitioner did not include the claim that the State failed to disclose that the prosecutor in Petitioner's case previously represented Jackson in a criminal proceeding.  See Ex. C at 53-78. However, this claim is without merit because this information does not constitute Brady material.

After his first postconviction proceeding in 1988, Wright made public records requests from which he received numerous documents. The first set of documents produced in 1991 included police investigation reports regarding criminal activity in the neighborhood of the murder. Wright asserts that these reports demonstrate that the police did not adequately investigate other potential suspects, including Henry Jackson. A second set of documents was produced in 1996 and 1997. These documents, Wright argues, demonstrate failures and inadequacies of the police investigation and demonstrate that the investigating officer was dishonest. Wright also draws an inference from the lack of documents which, he argues, would exist if the police adequately considered other suspects. The documents Wright lists in his claim include Jackson's criminal history, neighbors' complaints to police about Jackson, and police reports involving other known criminals in the neighborhood which involve events completely unrelated to those in this case. All of this information, he alleges, is Brady evidence and entitles him to a new trial.

The United States Supreme Court announced in Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the three elements that a defendant must establish in order to successfully assert a Brady violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Accord Occhicone v. State, 768 So.2d 1037, 1041 (Fla. 2000). The burden is on the defendant to demonstrate that the evidence he claims as Brady material satisfies each of these elements. Even where favorable evidence is suppressed, a new trial will not be necessary where it is determined that the favorable evidence did not result in prejudice. See Cardona v. State, 826 So.2d 968 (Fla. 2002). The Court in Strickler explained that prejudice is measured by determining "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

As noted above, the evidence Wright claims as Brady material consists of information contained in police files

31

concerning other possible suspects and other criminal activity in the same neighborhood. This is the same type of evidence that this Court recently addressed in Carroll v. State, 815 So.2d 601 (Fla. 2002). In Carroll, the defendant argued that the State withheld favorable evidence that consisted of police investigative notes that linked the defendant with another suspect, that another person was believed by the family to be involved, and that other crimes, including another rape, had occurred in the neighborhood. In denying relief on this issue, we said, "As noted by the State, the prosecution is not required to provide the defendant all information regarding its investigatory work on a particular case regardless of its relevancy or materiality." Id. at 620. Likewise, investigators in this case were not required to provide all of the notes and information regarding their investigation. Thus, Wright has failed to demonstrate that the evidence should have been disclosed.

However, even if the State should have disclosed the evidence, Wright has not demonstrated prejudice by the failure to do so. In order to be entitled to relief on a Brady claim, the defendant must also show that the evidence "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Gorham v. State, 521 So.2d 1067, 1069 (Fla. 1988). There has been no such showing in the instant case. The mere possibility that undisclosed items of information may have been helpful to the defense in its own investigation does not establish constitutional materiality. See United States v. Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Gorham v. State, 521 So.2d 1067, 1069. The fact of other criminal activities and the existence of other criminals in the same neighborhood where this murder occurred does not affect the guilt or punishment of this defendant.

We agree with the trial court's determination that the exculpatory effect of the documents is merely speculative; therefore, we affirm the trial court's denial of relief on this issue.

Wright, 857 So.2d at 869-70.

After a thorough review of the record and the applicable law, this Court concludes that

the state court's adjudication of this portion of this claim was not contrary to clearly

32

established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Petitioner is not entitled to relief on this portion of his claim.

### 3.  The Portions of this Claim Raised in the 3.851 Motion

Next, Petitioner points to the Affidavit of Idus Hughes, in which Hughes stated that he saw Jackson and two other men standing across the street from the victim's house at approximately 12:30 or 12:45 a.m. the day the victim's body was found.  Amended Petition at 16-19.  Petitioner also identifies the affidavit of Ronald Thomas, in which Thomas relates that Idus Hughes saw Jackson and two other men standing across the street from the victim's house the day the victim's body was found.  Thomas also states that a detective placed Thomas in a cell with Westberry and asked Thomas to try to discover what Westberry knew about the murder; however, Westberry said that he did not want to talk about it. Amended Petition at 63-64.

Petitioner presented this portion of this claim in his third motion for post-conviction relief (his 3.851 motion), see Ex. Y-4 at 13-15, and the circuit court found that the Hughes affidavit was not Brady material and the claim was procedurally barred.  Ex. Y-2 at 311-12. Upon Petitioner's appeal, the Florida Supreme Court  adjudicated the claim as follows:

> Wright contends that he is entitled to relief because the Thomas and Hughes affidavits demonstrate a Brady violation, a Giglio violation, ineffective assistance of counsel, and newly discovered evidence.  We disagree and hold that the circuit court's summary denial was appropriate.  This is Wright's third postconviction motion.  The Thomas and Hughes affidavits do not put this case in a new light.  We found on Wright's direct

appeal that the record contained unrefuted testimony that three individuals were gathered near the victim's home. Wright, 473 So.2d at 1280. The fact that Idus Hughes and Ronald Thomas have come forward with information about Henry Jackson and that three individuals were gathered near the victim's home does not affect the guilt or punishment of this defendant. See Wright, 857 So.2d at 870; see also Tompkins v. State, 980 So.2d 451, 458-59 (Fla. 2007) (noting that the statements in the affidavit do not provide any new information), cert. denied, --- U.S. ----, 128 S.Ct. 895, 169 L.Ed.2d 747 (2008). Therefore, Idus Hughes' and Ronald Thomas's affidavits, when considered with the other evidence presented at trial, are not of such nature that they would probably produce an acquittal on retrial. Jones v. State, 591 So.2d 911, 915 (Fla. 1991) (Jones I). Accordingly, the trial court properly denied relief on this claim.

Wright, 995 So.2d at 327 (footnotes omitted).

After a thorough review of the record and the applicable law, this Court concludes that the state court's adjudication of this portion of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Petitioner is not entitled to relief on this portion of his claim. In sum, Petitioner is not entitled to relief on his claims raised in ground one.[25]

_____

[25] To the extent that Petitioner alleges that defense counsel was ineffective for failing to discover and/or present this evidence, the Court finds this claim to be without merit since there is no reasonable probability that, had this information been presented to the jury, the outcome of the proceeding would have been different. Moreover, Petitioner has not alleged any facts that would support his assertion that the prosecutor presented false or misleading testimony. Finally, Petitioner presents several additional Brady claims in Petitioner's Memorandum that are not raised in the Amended Petition. Specifically, he alleges that the prosecution failed to disclose that there was a lack of documentation and forensic testing. See Petitioner's Memorandum 25-36, paragraphs m through o. Of course, the failure to disclose something that does not exist cannot form the basis of a Brady violation.

## B. Ground Two

Petitioner contends that he was denied the effective assistance of counsel at the guilt phase of the trial.  In his first claim, he asserts that counsel was ineffective for introducing testimony that Petitioner possessed a glass jar containing coins after the murder, but then failed to present evidence that the glass container did not come from the victim's house because it belonged to Petitioner's mother.  Amended Petition at 68-75.  The following facts are pertinent in assessing this claim.  At trial, Charles Westberry testified that Petitioner said he took a jar of change from the victim's house after killing her and buried it in the woods behind the victim's house.  Ex. A-14 at 2135-36.  Later on during the trial, the prosecutor informed the court that a newly discovered witness, Charlotte Martinez, had just come forward and informed the State that she had a jar full of change that had previously been in the possession of the Petitioner.  Id. at 2322.  However, the next day, the prosecutor informed the court that he would not attempt to introduce the glass container into evidence. Ex. A-15 at 2345.  The State did not call this witness and did not introduce the container into evidence.

Mr. Pearl reserved his opening statement until after the State rested.  During his opening statement, he said the following:

> Charlotte Martinez will be called to testify that sometime in mid-February close to her brother's birthday or within two or three days before that, and that her brother's birthday is about February 9th of 1983, that she went to the Defendant Jody[26] Wright's house, and that he there produced and brought out a container with coins in it, and that those --

---

[26] The record reflects that Petitioner Joel Dale Wright has the nickname "Jody."

> She will further testify that she had told -- that he had told her that his check had not come and he had no other money but his piggy bank; that Mis Martinez, others in the car, wanted to buy and drink beer, and so that they counted out about approximately seven dollars in pennies and other change out of that container, went to the Miller's and bought beer with that.
>
> By that we hope to demonstrate to you that the $209.00 kitty that Charles Westberry testified to[27] could not have been in existence, or if it was that Jody Wright didn't know about it or otherwise he wouldn't have used that money to buy beer.

Ex. A-15 at 2445-46.

During the defense case, Mr. Pearl called Ms. Martinez.  She testified that in mid-February, 1983, she and some other people picked up Petitioner at his house so that they could all go over to her house and drink some beer.  Id. at 2519.  Nobody in the car had any money to buy the beer.  Petitioner told her that he was waiting for his check and that he would have "to break into his bank to get money because his check didn't come that day." Id. at 2521.  He brought a glass vase containing change into the car.  Id.  They used about $7.00 of this change to purchase beer.  Id. at 2523.

During closing argument, the prosecutor argued the following:

> Then we heard from Mrs. Charlotte Martinez about this jar.

---

[27] Charles Westberry testified at trial that while Petitioner was telling Westberry about killing Ms. Smith, Petitioner "pulled out the money that he got out of Miss Smith's pocketbook and was counting it."  Ex. A-14 at 2137.  There was approximately $290.00.  Id. at 2138. Westberry testified that Petitioner gave Westberry some of this money and told him "to keep it for him until he could use it."  Id. at 2158.  According to Westberry, during the next three weeks, Petitioner came over several times to retrieve some of the money.  Id. at 2158-59.

The State's the first to admit that the jar can either be attached to the residence of Lima Paige Smith or it can be unattached from the residence of Lima Paige Smith.

You've not had any competent testimony as to who the owner of that jar was or where that jar was originally obtained.

But it was a jar of coins, it was a jar of change, and it was used and in the possession of Joel Dale Wright around the middle of February of this year.[28]

View that in terms of what we heard from Charles Westberry about the Defendant saying not only did I take this folding money but there was a jar of coins that I took and hid behind the house.

Add that to the testimony of Charlotte when she was asked, where did Jody get that from?  Well, I don't really know.  Inside the house, I guess, but he could have got it from somewhere else.  I don't know.

Ex. A-16 at 2741-42.  Thus, Petitioner contends that Mr. Pearl  was ineffective for presenting the testimony of Ms. Martinez without providing additional testimony that the glass container was part of a set owned by Petitioner's mother.[29]

---

[28] In his closing argument, Mr. Pearl asked the jury to consider why, if the Petitioner stole $290.00 from the victim, he was "so broke two weeks later that he had to get his piggy bank out of his house, his vase?"  Ex. A-16 at 2782.  He advised the jurors that the prosecutor "called it a jar because he wants you to think, hey, there's some connection with the jar Charles said was buried."  Id. at 2783.  He further argued, "The lady said it was a vase, not a jar.  So let's not be overcome by talking traits."  Id.

[29] At the evidentiary hearing on Petitioner's first 3.850 motion, Petitioner's sister, Nan Carol Walter, testified that she was present when Petitioner took the glass container from the house.  She stated that he kept his change in it and "he was counting out pennies to get a pack of cigarettes, and this girl d[r]ove up.  An he said, well, I'll just take the jar with me[.]"  Ex. G-4 at 635.  Mr. Pearl testified that after the State disclosed Ms. Martinez as a possible witness, Petitioner's sister, Mrs. Wiggs, "identified that glass jar as one having been bought by her together with a group of matching glasses and given to [Petitioner]'s mother, which would have established ownership clearly."  Ex. G-5 at 818.  Mr. Pearl also went to

In his second claim, Petitioner contends that counsel was ineffective for failing to corroborate Petitioner's assertion of innocence.  Petitioner's father, Marion Wright, stated in his deposition that Detective Douglas made the following statement to Petitioner, "I cannot understand why they don't go ahead and confess and we don't have to go through all this rigamarole."  Amended Petition at 76-77; Ex. A-2 at 392.  At trial, Petitioner testified that Detective Douglas made the following statement to Petitioner, "Well somebody ought to just confess to this."  Ex. A-15 at 2539.  Thus, Petitioner asserts that defense counsel was ineffective for failing to elicit the above-referenced deposition testimony of Marion Wright at trial to corroborate Petitioner's trial testimony.

Next, Petitioner asserts that defense counsel could have supported Petitioner's truthfulness and accurate recollection with the testimony of Petitioner's aunt, Gloria Clark. Amended Petition at 77-78.  In her deposition, Ms. Clark stated that she had visited her sister (Petitioner's mother) at about 4:30 to 5:00 p.m. on Sunday, February 6, 1983.  After she had been visiting with Petitioner's parents for about thirty to thirty-five minutes, Petitioner came home and told them that there were police cars around Ms. Smith's house.  See Ex. A-2 at 352-53.  At trial, Petitioner testified that, when Charles Westberry dropped Petitioner off at his parent's house that Sunday afternoon, his father was inside the house.  After Petitioner

_____

Petitioner's parent's home and in the "cupboard were either six or eight glasses that absolutely and perfectly matched the glass jar." Id.  However, Mr. Pearl forgot to introduce such evidence "perhaps due to the pressure of other matters during the trial." Id. at 820. Mr. Pearl testified that his failure to introduce such evidence constituted "inferior performance." Id.  Of course, "[b]ecause the adequacy of an attorney's performance is measured against an objective standard of reasonableness, the fact that trial counsel admits that his performance was lacking is of little, if any, consequence." Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1246 n.11 (11th Cir. 2009), cert. denied, 130 S.Ct. 2367 (2010).

went inside, he told his father what was happening at Ms. Smith's house.  Ex. A-15 at 2568.

Charles Westberry testified that, when he dropped Petitioner off at his parent's house

Sunday afternoon, Petitioner's father was standing on the front porch of his house.  Ex. A-14

at 2155.  Thus, Petitioner asserts that Mr. Pearl was ineffective for failing to call  Ms. Clark

as a defense witness because her testimony would have corroborated Petitioner's trial

testimony and refuted Charles Westberry's trial testimony.[30]

Next, Petitioner asserts that defense counsel failed to properly impeach Walter

Perkins.[31]  Amended Petition at 78-80.  Specifically, Petitioner asserts that during the 1997

evidentiary hearing on his second 3.850 motion, his sister, Bobbi Mixon, testified that there

was "bad blood" between her family and Officer Perkins.  Ex. N-14.  She testified as follows:

> [W]e saw the police car drive up.  And we saw Walter get out of
> the car, come up to the house.  And my mom went out on the
> porch in her gown, in a housecoat, and me and my younger
> sister was [sic] standing at the screen door. . .
>
> And Walter came up there and said, told my mother --
> one of my brother's [sic] was seeing one of his stepsisters, so
> both my brother's [sic] would go do down [sic].  And he came
> down there and told my mother that he wanted her to make my
> brothers stop going down there to see his stepsister.
>
> And my mom in return told him that whenever his step-
> dad, Julian, and I can't remember the last name, told them they

---

[30] The Court notes that the State called Petitioner's father as a rebuttal witness, and he testified that he was either coming out through the door of his home or he was on the front porch of his home when Petitioner arrived home that Sunday afternoon.  Petitioner's father was walking towards Ms. Smith's house because his wife had asked him to find out why the police cars were at Ms. Smith's house.  Ex. A-15 at 2574-75.

[31] Defense counsel's cross-examination of Perkins is located in Ex. A-15 at 2352-70, 2373.

> couldn't come down there any more she would tell them.  Walter did not live with them.  And Walter said, well, if you can't keep those two boys from down there at my sister's house, my dad's house, I'm going to make you sorry you ever had them two boys.  And my mother got very angry.  I mean, no one has the right to threaten you.  And she told Walter to get off her property and not to come back on her property unless he had a search warrant.
> . . .

Ex. N-14 at 2586-87.

At trial, during cross-examination, Mr. Pearl asked Officer Perkins if he and the Petitioner had "some personal difficulties in the past," and Officer Perkins replied, "None that I know of."  Ex. A-15 at 2364.  Thereafter, during a proffer outside the presence of the jury, the following colloquy ensued between Mr. Pearl and Officer Perkins.

> Q       Wasn't there a member of your family who was having trouble with Jody coming over to his house?
>
> A       No, sir, a problem with Jody's brother.
>
> Q       I see.  Did you -- now you got me confused.
>
> Did you at one time come to Jody's house dressed in uniform to take up that problem when Jody was present?
>
> A       I don't know if Jody was present or not.  His brother and his mother was present.

Id. at 2366.

Mr. Pearl then stated, "Okay.  Sorry.  I may have misunderstood the information I had.  Let me withdraw this line of questioning.  Officer Perkins is right and I am wrong."  Id.  The prosecutor then asked Officer Perkins when this incident occurred, and he replied, "Mr. Dunning, this has been many years ago.  I have no idea of the exact number of years."  Id.

at 2367.  Thereafter, the jury returned to the courtroom and Mr. Pearl stated, "Your Honor, may I say publically, what I said before, I am withdrawing that line of questioning because I was mistaken, and I wish to publically apologize to Officer Perkins for that misapprehension that I had."  Id.

Petitioner asserts that Mr. Pearl was ineffective for failing to pursue this line of questioning to show that Officer Perkins had a motive for lying about Petitioner's confession. Amended Petition at 79.  Petitioner further asserts that Mr. Pearl's public apology "served as an endorsement of Perkins."  Id.

Next, Petitioner contends that counsel was ineffective in his cross-examination of Charles Westberry, for failing to point out the inconsistencies in his various accounts of what happened in this case.[32]  Amended Petition at 80-88.  He also alleges that Mr. Pearl failed to elicit testimony from Paige Westberry that would have impeached the testimony of Charles Westberry.  Id. at 86-87.  Additionally, Petitioner asserts that Mr. Pearl should have called Shirley Bowen[33] to cast doubt on Charles Westberry's credibility.  Id. at 88.

---

[32] Defense counsel's cross-examination of Westberry is located in Ex. A-14 at 2162-98, 2202-04.  The record reflects that defense counsel did point out several inconsistencies in Westberry's various statements.

[33] Ms. Bowen was the victim's niece.  In her deposition, she stated that Ms. Smith had complained that "somebody had been breaking into the house quite often."  Ex. A-2 at 215. Ms. Bowen estimated that the victim's home had been broken into over 100 times during the two-year period preceding her death.  Id. at 236.

Finally, Petitioner asserts that Mr. Pearl was ineffective for failing to obtain and introduce evidence of Henry Jackson's guilt.[34]  Id. at 88-89.  Specifically, he asserts that counsel should have obtained Kim Holt's statement to the police and called her as a defense witness at trial.  Id.

Petitioner raised these ineffectiveness claims in his first 3.850 motion, and the trial court adjudicated them as follows:

> In Claim II the Defendant alleges ineffective assistance of counsel at both the guilt and sentencing phases of the trial, including allegations that are also claimed in subsequent claims contained herein.  Some examples of the numerous allegations include trial counsel's failure to impeach key state witnesses, failure to make objections, failure to prevent introduction of other crimes, etc.  Such allegations are completely without merit.  "It is well established that for relief to be granted pursuant to a claim of ineffective assistance of counsel, a defendant must show that counsel's conduct included a specific omission or overt act which was a substantial and serious deficiency, measurably below that of competent counsel. Then, it must be shown that counsel's performance was prejudicial to the defense", Atkins v. Dugger, Nos. 73, 869 and 73, 910 [541 So.2d 1165] (Fla. Apr. 13, 1989).  Defendant's offer of proof with regard to his allegations of ineffective assistance of trial counsel are insufficient to demonstrate deficient conduct below those professionally recognized and accepted standards of professional conduct as enunciated by the U.S. Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  Additionally, the majority of the alleged errors are strategic in nature and this Court will not second guess trial strategy employed by trial counsel.

---

[34] The testimony of Mr. Pearl, his investigator Freddie Williams, Detective Taylor Douglas and Captain Clifford Miller at the evidentiary hearing reflects that the defense did investigate Jackson as a possible suspect, but, as noted previously, the police eliminated him as a suspect when they verified that the money Jackson used to pay Ms. Holt at the grocery store was money he had been paid to cut down some trees.

Ex. G-6 at 1086.  Upon Petitioner's appeal, the Florida Supreme Court quoted the trial court's order denying the 3.850 motion and found "that the trial court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion."  <u>Wright</u>, 581 So.2d at 886.

After a thorough review of the record and the applicable law, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.[35]  Thus, Petitioner is not entitled to relief on this claim.

## C. Ground Three

Petitioner contends that he was denied the effective assistance of counsel at the penalty phase of the trial because counsel presented inconsistent theories at the sentencing phase.  Specifically, he asserts:

> First, he had Mr. Wright's wife testify that Mr. Wright was a good husband and father (R. 2948)[36].  Next, he had Mr. Wright's brother testify that Mr. Wright was not "especially cruel or wicked"  (R. 2952)[37].  Then he had Mr. Wright's sister testify that Mr. Wright did not exhibit "tendency toward violence, savagery [or] meanness" (R. 2957)[38].

---

[35] Even though Mr. Pearl characterized his own performance regarding the glass jar as deficient, the state courts reasonably found that Mr. Pearl's performance was not constitutionally deficient, a finding as to which this Court owes "double deference." <u>Knowles</u>, 129 S.Ct. at 1420.  Likewise, the Florida Supreme Court's adjudication of the remaining ineffectiveness claims was not contrary to or an unreasonable application of <u>Strickland</u>.

[36] <u>See</u> Ex. A-17 at 2948.

[37] <u>See</u> Ex. A-17 at 2952.

[38] <u>See</u> Ex. A-17 at 2957.

Amended Petition at 91.  Petitioner also asserts that counsel was ineffective for introducing a nine-year-old psychological report[39] instead of obtaining a current psychological report to introduce at sentencing.  Id. at 91-96.

At the evidentiary hearing on this claim, Mr. Pearl testified that he "had some misgivings" about introducing the old report; however, he "felt it would not be harmful, since Jody had already been convicted of first degree murder, to use the earlier report, hoping that some jury sympathy might arise as the result of his earlier unhappy childhood."  Ex. G-5 at 852.  He also noted that the prosecutor conducted a brilliant cross-examination of Petitioner, and the cross-examination was quite damaging to the defense.  Thus, he explained:

> And I thought it would be important for the jury to know that this brilliant prosecutor was dealing with a young man who had borderline intelligence, that he was poorly educated, that he had trouble relating to people, which would mean he might have also trouble expressing himself well.  And I was hoping that the jury would see that maybe Jody wasn't as bad as he -- or as guilty as he seemed to be by the admissions he had to make in response to that impeaching cross-examination, which was devastating.

Id. at 860.

Mr. Pearl could not recall exactly why he decided not to request a current evaluation and psychological report from Dr. Krop.  However, he testified that he was convinced of Petitioner's innocence and his approach during the penalty phase was "a lingering doubt theory[.]"  Id. at 853.  Thus, he had made up his mind that he was not going to put on any

---

[39] This report was read to the jurors during the penalty phase of the trial.  See Ex. A-17 at 2961-65.  The Respondents have also provided the Court with a copy of this report.  See Ex. A-5 at 839-41.

evidence at the penalty phase that would "admit or imply that Jody Wright was guilty[.]"  Id.

at 854.  In sum, he testified:

> And so I think that finally that I did not feel that Dr. Krop
> could be of any help to Jody, and therefore I did not have him
> appointed.  I did not want to have him appointed, have him make
> his examination, and then not be called.  I didn't think that that
> would be any help to me in making a tactical decision as to how
> I was going to handle Phase II.  And so I did not have Dr. Krop
> appointed.

Id.

On January 19, 1988, Dr. Krop examined Petitioner at the request of post-conviction

counsel.  Ex. G-6 at 1019.  After examining Petitioner and conducting several tests, Dr. Krop

concluded that Petitioner suffered from "no real significant mental illness" and the testing

revealed "no significant psychopathology."  Id. at 1024, 1029.  Dr. Krop also testified that

Petitioner's background did not contain any evidence of a violent nature.  Id. at 1026.  His

testing also revealed "no indications of any sexual deviant propensities."  Id. at 1030.  In

sum, he concluded that "there was no evidence of any kind of abnormal behavior patterns

or mental illness."  Id. at 1031.

Petitioner raised these claims in his first 3.850 motion, and the trial court adjudicated

the claims as follows:

> The Defendant alleges in Claim III that defense counsel
> was ineffective for failure to call additional witnesses to testify as
> to the Defendant's character.  Trial counsel made a strategic
> decision as to which witnesses to call to testify on behalf of the
> Defendant.  It was then up to the jury whether to believe the
> witnesses presented by the defense or the State.  Clearly, such
> a tactical decision is not subject to collateral attack.

The Defendant also alleges in Claim III that use by trial counsel of a juvenile psychiatric evaluation was ineffective assistance of counsel. Defense counsel testified at the evidentiary hearing that the decision to use the evaluation was "a balancing act." Defense counsel testified that he was unsure what a current evaluation would disclose and chose to go forth with the previous examination. An excerpt of the defense counsel's testimony is attached hereto as exhibit "8". Again, defense counsel made a tactical decision which is not subject to collateral attack.

Ex. G-6 at 1087. Upon Petitioner's appeal, the Florida Supreme Court quoted the trial court's order denying the 3.850 motion and found "that the trial court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion." Wright, 581 So.2d at 886.

Upon a thorough review of the record and the applicable law, this Court concludes that the state court's adjudication of these ineffectiveness claims was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Petitioner is not entitled to relief on these claims.[40]

### D. Ground Four

Petitioner alleges that he was denied his right to trial by a fair and impartial jury due to juror misconduct, the trial court's failure to adequately inquire into such misconduct and

---

[40] Additionally, this Court finds this claim to be without merit. Although Mr. Pearl's performance may well have been deficient in failing to obtain a current psychological examination, especially in light of the fact that the findings would have been provided only to the defense, this Court is convinced that Petitioner was not prejudiced by counsel's performance in this regard because Dr. Krop's updated opinion, introduced at the post-conviction hearing, showed it would not have been helpful to Petitioner. See Ex. G-6 at 1019-31.

the trial court's failure to ensure that Petitioner's jury was fair and impartial. Amended Petition at 97-102. Specifically, Petitioner asserts that: (1) at least one juror slept throughout much of the trial; (2) the jurors shifted the burden of proof to Petitioner; and (3) one of the jurors stated that she had made up her mind before trial and she would need only five minutes to convict Petitioner.

The following portions of the record are pertinent in assessing this claim. During the trial Kenneth Schwing, the bailiff, informed the court that he had overheard a conversation between two women who were spectators at the trial, in which one of the women stated that a lady on the jury expressed an opinion before the trial commenced that the Petitioner was guilty and that she would take no more than five minutes to render a vote in favor of guilt. Ex. A-17 at 2832-33. The court asked Mr. Schwing to look around the courthouse to see if he could locate these two women, but he was unable to do so. Id. at 2833. The parties and the judge agreed that the judge would interview these two women if they could be located. Id.

Thereafter, the judge questioned Mr. Schwing under oath in chambers in the presence of defense counsel and the prosecutor. Mr. Schwing testified that earlier that week, while he was sitting in the courtroom, he overheard a conversation between two women who were seated behind him. Id. at 2841-42. One of their friends was on the jury, and "they were talking about how she had already made up her mind that the man was guilty, and it wouldn't take her at least five minutes when they got to the back room to decide the case, that she would find him guilty." Id. at 2842. Mr. Schwing stated that a third woman in the audience

47

was friends with the two women who had this conversation, and he agreed to point this third woman out to the bailiff.  Id. at 2845-46.

The third woman, Beulah Cannon, was located and brought to the judge's chambers. Id. at 2846.  Ms. Cannon stated that the two women in question were Marlene Tyler and either "Eva Lee or Ava Lee."  Id. at 2847.  According to Ms. Cannon, these two women knew Miss Hayes, one of the jurors.  Id.  Thereafter, the judge located Ms. Tyler's telephone number and called her.  Ms. Tyler told the judge that she knew Juror Hayes, but she had not had any conversations with Ms. Hayes about the trial, and that she did not participate in the conversation reported by Mr. Schwing.  Id. at 2855.  She said that someone "may have mentioned during one of the recesses that they hoped it took more than five minutes for them to make up their minds, but she doesn't know who said that, to whom, or about whom in this case."  Id. at 2855-56.  She stated that Ava Lee Thornton was the women she was seated next to at trial.  Id. at 2856.

The bailiff attempted to find Ms. Thornton in the courthouse, but was unable to do so. Id. at 2857.  The judge asked defense counsel if he wished to pursue this matter further, and Mr. Pearl responded as follows:  "I think for the time being in any event, Your Honor, we have exhausted, as far as we can go, exhausted the possibility.  The only other possible thing we could do would be call every member of the audience that we can find and inquire, and I don't see how that can be productive."  Id. at 2857-58.  Thereafter, no further inquiry was made.  Mr. Pearl did not request that juror Hayes be removed from the jury.

During Petitioner's first post-conviction proceedings, he filed a notice of intent to interview jurors.  At a hearing on the request to interview jurors, Judith Marks, a deputy clerk

48

at the court, testified that Ms. Wilkinson, one of the jurors in Petitioner's case, spoke with Ms. Marks about the case.  During the conversation, Ms. Marks asked Ms. Wilkinson how they came to the conclusion that Petitioner was guilty.  Ex. G-8 at 1451.  Ms. Wilkinson replied that "the State did not prove him guilty, but the Defense had not proved him innocent."  Id. at 1452.

Ms. Marks also testified that she observed a female juror who appeared to be sleeping "[a]lmost everyday" of the trial.  Id. at 1454.  When asked how she knew this juror was sleeping, she replied, "She had her eyes closed, and her head would fall forward, and she would wake up."  Id.  On cross-examination, she admitted that she did not hear this juror snore and that she could not "testify for sure the person was sleeping, only that it looked like [she was] sleeping[.]"  Id. at 1454-55.  Wanda Fussell, a spectator at Petitioner's trial, also testified that she observed a male juror who appeared to be sleeping on one occasion when pictures were being displayed to the jury.  Id. at 1458-59.

The trial court denied the request to interview jurors, finding:

> that the alleged statement of juror Sandra Wilkinson to former deputy Clerk of Court Judith Marks concerning how she (juror) felt concerning the Defendant's guilt are not matters of external influence and are those that essentially inhere in the verdict itself.  Tanner [v. United States], 107 S.Ct. 2739 (1987),[41] U.S. v. Sjeklocha, 843 F.2d 485 (11th Circuit 1988).  Florida Bar v. Newhouse, 498 So.2d 935 (Fla. 1986).  Ehrhardt, Florida Evidence, 90.607 2(a)(b) (2d Ed. 1984).

---

[41] In Tanner v. United States, 483 U.S. 107, 121 (1987), the Court noted that both common law and Fed. R. Evid. 606(b) prohibit admission of jury testimony to impeach a jury verdict, with the exception of juror testimony relating to extraneous influences upon the jury.

In addition, Ms. Marks stated that she did not remember said juror speaking of any outside (external) influence on the jury, and said witness did not testify to any outside external influence.

The Defendant elicited additional live testimony from Ms. Marks that she observed a juror that she could not positively say was sleeping, but rather "appeared" to be sleeping. Regardless, this issue, raised nearly five (5) years after trial is not a matter of external influence and judged by evidentiary standards does not amount to proof that the juror was sleeping by a preponderance of the evidence. Tanner v. U.S., (Supra)[42], U.S. v. Sjeklocha, (Supra), Florida Bar v. Newhouse, (Supra), Orange County v. Fuller, 502 So.2d 1364 (Fla. 5th DCA 1987).

. . . .

Upon considering the testimony of Wanda Fussell, the court finds she was a friend of the Defendant prior to the trial in 1983, attended the trial, did not believe he was guilty, and she could not with any definiteness state that a juror was sleeping, only that a juror appeared to be sleeping during trial. Her testimony did not prove any juror was sleeping by any preponderance of the evidence. Regardless, her allegations do not amount to any scintilla of external influence on a juror and in fact such testimony is such that would essentially inhere in the verdict itself. Tanner v. U.S., U.S. v. Sjeklocha, Florida Bar v. Newhouse, Ehrhardt, Florida Evidence, 90.607 2(a)(b), Orange County v. Fuller, (Supra).

. . . .

As to paragraph 2d, the Defendant presented no testimony of Kenneth Schwing and in this regard any testimony of Kenneth Schwing which is substantially the same as his trial testimony (record on appeal 2841 through 2848) is a matter that was known to the Defendant, was capable of being raised on

---

[42] In Tanner, 483 U.S. at 126, the Court found an allegation that some jurors were observed to be "falling asleep all the time during the trial" was insufficient "to bring this case under the common-law exception allowing post-verdict inquiry").

50

> appeal and upon the State[']s Motion to Strike is hereby
> st[r]icken. <u>Mills v. State</u>, 507 So.2d 602 (Fla. 1987).

Ex. G-2 at 238 (paragraph enumeration omitted).

Thereafter, Petitioner raised this juror misconduct issue in his first 3.850 motion, and

the circuit court adjudicated the claim as follows:

> Defendant's allegation in Claim V as to juror misconduct
> was previously determined by this Court to be an issue inhering
> in the verdict and not the subject of external influence. A copy
> of the September 19, 1988 order of this Court denying the
> Defendant's amended notice to interview jurors is attached
> hereto as Exhibit "10".

Ex. G-6 at 1088.  Upon Petitioner's appeal, the Florida Supreme Court found "that the trial

court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion."

<u>Wright</u>, 581 So.2d at 886.

After a thorough review of the record and the applicable law, this Court concludes that

the state court's adjudication of this claim was not contrary to clearly established federal law,

did not involve an unreasonable application of clearly established federal law, and was not

based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceedings.  Thus, Petitioner is not entitled to relief on this claim.[43]

---

[43] As noted previously, Petitioner also filed a Motion to Interview Jurors (Doc. #28) in this
Court and asserts that he is entitled to such discovery on this matter and an opportunity to
prove a constitutional violation.  <u>See</u> Amended Petition at 102.  However, Petitioner's Motion
to Interview Jurors (Doc. #28) will be denied because "courts can inquire only as to 'external'
influences over the jury's deliberations." <u>Sireci v. Attorney General of Fla.</u>, 406 Fed.Appx.
348, 351 (11th Cir. 2010) (per curiam) (not selected for publication in the Federal Reporter)
(citing <u>Tanner</u>, 483 U.S. 107).  Moreover, such a motion cannot be entertained in a federal
habeas action.

## E. Ground Five

Petitioner asserts that the prosecutor's closing argument during the guilt phase denied Petitioner a fair trial.  Amended Petition at 103-06.  Respondents contend, and this Court agrees, that this claim is procedurally barred.

Petitioner raised this issue in his first 3.850 motion, and the trial court adjudicated it as follows: "Claim X alleges prosecutorial misconduct for statements made during the State's closing argument.  It is this Court's opinion that the prosecutor did not overstep the bounds with his closing remarks to the jury.  Mills v. State, 507 So.2d 602 (Fla. 1987).  Additionally, such a claim could have and should have been raised on direct appeal.  Adams v. State, 380 So.2d 423 (Fla.1980)."  Ex. G-6 at 1090.  Upon Petitioner's appeal, the Florida Supreme Court found "that the trial court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion."  Wright, 581 So.2d at 886.

> It is by now abundantly clear that [a federal court] cannot consider a claim where "the last state court rendering a judgment in the case clearly and expressly state[d] that its judgment rests on a state procedural bar."  Parker v. Sec'y, Dep't of Corr., 331 F.3d 764, 771 (11th Cir. 2003) (quotation marks and citation omitted).  Accordingly, "[a] federal habeas claim may not be reviewed on the merits where a state court determined . . . that the petitioner failed to comply with an independent and adequate state procedural rule that is regularly followed."  Philmore v. McNeil, 575 F.3d 1251, 1260 (11th Cir. 2009); see also Judd,[44] 250 F.3d at 1313 ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citing Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).  "The doctrine of procedural default was developed as a means of

---

[44] Judd v. Haley, 250 F.3d 1308 (11th Cir. 2001).

> ensuring that federal habeas petitioners first seek relief [in state court] in accordance with established state procedures." <u>Judd</u>, 250 F.3d at 1313.

<u>Spencer v. Sec'y, Dep't of Corr.</u>, 609 F.3d 1170, 1178-79 (11th Cir. 2010), <u>cert</u>. <u>denied</u>, 131 S.Ct. 1049 (2011).

> There is no doubt that, under Florida law, a claim is procedurally barred from being raised on collateral review if it could have been, but was not raised on direct appeal. <u>See</u> <u>Philmore</u>, 575 F.3d at 1264 ("Florida law bars claims in a state post-conviction proceeding that could have been raised on direct appeal."); <u>see</u> <u>also</u> <u>Smith v. State</u>, 445 So.2d 323, 325 (Fla. 1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). Moreover, [the appellant] has made no claim that this rule is not regularly followed by the Florida courts. Indeed, Fla. R. Crim. P. 3.850, which governs the collateral review process in Florida, itself clearly states "[t]his rule does not authorize relief on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence." <u>See</u> <u>also</u> <u>Bates v. Dugger</u>, 604 So.2d 457, 458 (Fla. 1992) ("Rule 3.850 does not authorize relief based upon grounds which could have been or should have been raised at trial and, if properly preserved, on direct appeal.") (quotation marks and citation omitted).

<u>Id</u>. at 1179.

Here, the trial court properly found the prosecutorial misconduct claim to be procedurally barred, and in the alternative, found the claim to be without merit. The Florida Supreme Court upheld the trial court's ruling. The Eleventh Circuit has instructed that "where a [state] court makes an alternative merits determination, [the federal courts] remain bound by the application of the procedural bar. <u>See</u> <u>Parker</u>,[45] 331 F.3d at 774-75

---

[45] <u>Parker v. Sec'y, Dep't of Corr.</u>, 331 F.3d 764, 771 (11th Cir. 2003) .

(explaining that 'an alternative merits holding leaves the procedural bar in place')." Spencer, 609 F.3d at 1179 n.1; see also Philmore v. McNeil, 575 F.3d 1251, 1260 (11th Cir. 2009) ("We must abide by the Florida Supreme Court's decision [imposing a procedural bar], even though the court made an alternative merits ruling."); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim."). Thus, Petitioner has procedurally defaulted this claim.

"Procedural defaults in state courts will foreclose federal court review, absent a showing of cause and prejudice." Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 770 (11th Cir. 2003) (citing Wainwright v. Sykes, 433 U.S. 72 (1977)), cert. denied, 540 U.S. 1222 (2004). "[A] federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice." Fortenberry v. Haley, 297 F.3d 1213, 1222 (11th Cir. 2002) (per curiam) (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)), cert. denied, 538 U.S. 947 (2003). The fundamental miscarriage of justice exception is only available in extraordinary cases upon a showing of "'actual' innocence rather than [mere] 'legal' innocence." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted), cert. denied, 535 U.S. 926 (2002).

Petitioner has not shown cause and prejudice, nor has he demonstrated that he meets the requirements for the fundamental miscarriage of justice exception.  Thus, this Court will not address the merits of this procedurally barred claim.[46]

## F. Ground Six

Petitioner contends that Petitioner was denied an adversarial testing when the jury did not hear that the victim's house had been regularly burglarized.  Amended Petition at 107-10.  Petitioner raised this issue in his first 3.850 motion, and the circuit court adjudicated the claim as follows:

> Claim IX concerns an allegation by the Defendant that he should have been allowed to present evidence that the victim's house had been burglarized regularly.  Actually, the jury was informed that the victim's house had recently been burglarized, as the quote from the record, page 2593[47], contained on page 115 of the Defendant's Amended Motion to Vacate Sentence, illustrates.  The objection which was sustained by the Court merely disallowed the witness from testifying as to the number of break-ins as told to the witness by the victim[48] and not to the fact that there were "numerous break-ins in the last two weeks." An excerpt is attached hereto as Exhibit "12".  Clearly the jury was aware of the previous break-ins to the victim's home.  As the Defendant pointed out, the jury was never instructed to

---

[46] Even assuming *arguendo* that the Florida Supreme Court reached the merits of this claim and did not enforce the procedural bar, Petitioner is not entitled to relief because the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

[47] Clayton Hughes, an acquaintance of the victim, testified that Ms. Smith had been frightened during the two weeks preceding her murder because there had been "[n]umerous break-ins in that last two weeks." Ex. A-16 at 2593.

[48] The objection, based upon hearsay, was sustained.  Ex. A-16 at 2593.

disregard the witnesses' response by the Court, and it is highly
unlikely that the jury would misunderstand the objection and
disregard the statement by the witness.  As to the claim of
ineffective assistance of counsel, defense counsel did make an
attempt to continue questioning the witness about the number of
break-ins but the Court sustained the State's objection.

The Defendant also alleges that defense counsel should
have called a particular witness to testify as to those persons
that the victim suspected were involved in the previous
break-ins.  Such a decision is strategic in nature and,
consequently, not subject to collateral attack.  Neither defense
counsel's failure to continue questioning a witness when the
State's objection had been sustained by the Court, nor the
failure to call this particular witness was a "substantial and
serious omission measurably below that of competent counsel."
Knight v. State, 394 So.2d 997, 1001 (Fla. 1981).  Therefore,
both claims of ineffective trial counsel included in Claim IX are
denied.

Ex. G-6 at 1089-90.  Upon Petitioner's appeal, the Florida Supreme Court found "that the trial

court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion."

Wright, 581 So.2d at 886.

After a thorough review of the record and the applicable law, this Court concludes that

the state court's adjudication of this claim was not contrary to clearly established federal law,

did not involve an unreasonable application of clearly established federal law, and was not

based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceedings.  Thus, Petitioner is not entitled to relief on this claim.

### G. Ground Seven

Petitioner contends that he was denied the effective assistance of appellate counsel

for counsel's failure to argue on direct appeal that the prosecutor, during closing argument:

(1) falsely suggested that the jar of money Petitioner possessed after the murder was the jar

stolen from the victim, Amended Petition at 111-14; (2) misled the jury about the time of death, id. at 114-17; (3) misrepresented Dr. Latimer's testimony regarding a right-handed assailant, id. at 117-19; (4) misrepresented the testimony of David Layton,[49] id. at 119-22; and (5) misrepresented the testimony of Patricia Lasko. Id. at 122-25. Petitioner also asserts that appellate counsel should have raised the following additional issues on direct appeal: (1) the trial court erred in overruling Petitioner's objection to the State's questioning of Lasko regarding her ability to make successful hair comparisons in other cases, id. at 126-27; (2) the trial court erred in excusing jurors outside the presence of Petitioner and his attorney, id. at 127-28; and (3) the trial judge erred in telling the jurors that the sentencing decision was his alone. Id. at 128-29.

Petitioner raised these claims in his state habeas petition, and the Florida Supreme Court adjudicated them as follows:

> Wright argues that appellate counsel failed to raise numerous meritorious issues which would have warranted reversal. Claims of ineffective assistance of appellate counsel are reviewed under the standard enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The defendant must demonstrate that counsel's performance was below that expected of competent counsel and that counsel's deficient performance resulted in prejudice to the defendant. However, claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been raised on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla. 2000). Much of Wright's claim that appellate counsel was ineffective involves issues that were

---

[49] Throughout most of the state court proceedings, the latent print examiner is referred to as David Latent; however, the court reporter noted on the trial transcript that "[t]he name David Layton as spelled in the transcript David Latent, should read Layton." Ex. A-11 at 1607.

not preserved for appeal by trial counsel and should have been raised in a 3.850 proceeding for ineffective assistance of trial counsel.  Appellate counsel has no obligation to raise issues on appeal that were not preserved for review.[50]  See Robinson v. Moore, 773 So.2d 1, 4 (Fla. 2000).

Specifically, Wright argues that "appellate counsel failed to raise the prosecutor's 'knowing presentation of false argument to the jury.'"  This claim was raised in Wright's first postconviction proceeding, see Wright v. State, 581 So.2d 882, 884 (Fla. 1991), and will not be reconsidered in this habeas proceeding.  See Mann v. Moore, 794 So.2d 595, 600-01 (Fla. 2001) (finding that the defendant's claim was procedurally barred because the merits of the claim had been raised and rejected in two prior proceedings).

. . . .

Wright next argues that appellate counsel failed to raise the fact that Wright objected to the State's questioning of the hair expert.  The hair expert was asked how many times she had been called upon to match hair strands, and of those occasions, how many times she was able to make a finding. Defense counsel objected, arguing that the testimony sought was not the result of a scientific test and was therefore "irrelevant and in terms of its scientific accuracy and reliability, incompetent." Defense counsel argued that he stipulated to the expert's experience, but that this question called for testimony related to statistical matters that was scientifically unreliable.  The objection was not on the ground that the testimony was self-vouching, as Wright argues here.  In order to preserve an issue for appellate review, the issue must be presented to the lower court and the specific legal argument or ground to be argued on review must be part of that presentation.  Otherwise, the error is not considered preserved.  See Tillman v. State, 471 So.2d 32, 35 (Fla. 1985).  As stated above, appellate counsel is not ineffective for failing to raise on appeal an issue that was not preserved. See Freeman, 761 So.2d 1055.

---

[50]  Defense counsel did not object to any portions of the prosecutor's closing argument at issue in this ground.  See Ex. A-16 at 2700-01, 2711-12, 2714-15, 2741-42.

. . . .

Wright also argues that appellate counsel failed to challenge both his and trial counsel's absence from an off-the-record conference between the trial judge and at least one potential juror, after which the judge excused the juror. The record indicates that defense counsel was present in the courtroom when the trial judge conducted his initial inquiries to the jury panel. In the initial inquiry phase, the trial judge introduced court personnel and invited the potential jurors to approach the bench if they had any hardships that would prevent them from serving. After this invitation, there was an off-the-record discussion, whereupon the judge announced that he would excuse juror number 125 because that juror was the only available paramedic and full-time fire personnel in the community. Defense counsel made no objection to the off-the-record discussions between the judge and persons who approached the bench to discuss a potential hardship.

During the general qualification process under section 40.013(6), Florida Statutes (1997), removal of a potential juror for hardship is within the trial court's discretion. See Jones v. State, 749 So.2d 561, 562 (Fla. 2d DCA 2000). The Fifth District recently described the juror qualification proceeding stating, "Counsel or a defendant does not ordinarily participate in this type of qualification process, although neither is excluded from doing so. In many instances, counsel and the defendant are not present because this preliminary qualification process occurs days prior to the trial." O'Quendo v. State, 823 So.2d 834, 836 (Fla. 5th DCA 2002). In this case, the record does not indicate whether defense counsel participated in the off-the-record discussions with the potentially disqualified jurors. However, the record clearly indicates no objection was raised by defense counsel to the off-the-record discussions or the disqualification of any juror. Because the issue was not preserved at trial, appellate counsel cannot be deemed ineffective for failing to raise the issue on appeal. See Freeman v. State, 761 So.2d 1055, 1069 (Fla. 2000) ("[I]neffective assistance of counsel cannot be argued where the issue was not preserved for appeal. . . .").

Finally, Wright argues that appellate counsel failed to raise as error the trial judge's statement to the venire that the

> judge is responsible for sentencing decisions. This issue could
> have been raised on direct appeal if trial counsel had preserved
> the error. Appellate counsel cannot be considered ineffective for
> failing to raise issues which were not properly raised at trial or
> preserved for review. See Freeman.

Wright, 857 So.2d at 875-77 (footnote omitted).

Upon a thorough review of the record and the applicable law, this Court concludes

that the state court's adjudication of this claim was not contrary to clearly established federal

law, did not involve an unreasonable application of clearly established federal law, and was

not based on an unreasonable determination of the facts in light of the evidence presented

in the state court proceedings. Thus, Petitioner is not entitled to relief on this claim.

## H. Ground Eight

Petitioner contends that the Florida Supreme Court failed to comply with the

requirements of Sochor v. Florida when it affirmed Petitioner's sentence of death on direct

appeal. Amended Petition at 130-32. Petitioner raised this claim in his state habeas petition,

and the Florida Supreme Court adjudicated it as follows:

> Wright argues that this Court struck an aggravating
> circumstance on direct appeal and failed to reweigh the
> remaining aggravating and mitigating circumstances as required
> by Sochor v. Florida, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d
> 326 (1992). Wright also seems to argue that there was
> mitigating evidence presented that should have been found by
> the trial court.
>
> On direct appeal, we affirmed the trial court's order finding
> there were no mitigating circumstances. See Wright, 473 So.2d
> at 1282. Wright did not raise this claim in a motion for rehearing
> following our opinion in his initial appeal. We therefore conclude
> that he abandoned this claim. See Lightbourne v. State, 841
> So.2d 431, 442 (Fla. 2003) (finding that a claim which could
> have been raised in a motion for rehearing but was not was

60

abandoned and procedurally barred from consideration in a postconviction proceeding); see also Garcia v. State, 816 So.2d 554, 569 (Fla .2002). Therefore, to the extent Wright argues this Court erred in failing to find the existence of mitigation, this claim is procedurally barred.

We also deny Wright's claim made pursuant to Sochor v. Florida. On direct appeal, we struck the cold, calculated, and premeditated (CCP) aggravating factor, finding that the degree of heightened premeditation necessary for CCP was not proved beyond a reasonable doubt. We stated: "Because the court properly found there were no mitigating and three aggravating circumstances, we conclude the imposition of the death penalty was correct and find it unnecessary to remand for a new sentencing hearing. We also find the imposition of the death penalty in this case is proportionately correct." Wright, 473 So.2d at 1282 (citations omitted). We note that both our decision on direct appeal and our decision in Wright's appeal of the denial of his first 3.850 motion were issued prior to the Supreme Court's decision in Sochor. This habeas petition, filed nearly ten years after this claim arose, is the first time Wright has presented this issue for our review.

We conclude that even after removing CCP from consideration of the valid aggravating circumstances, three valid aggravating circumstances remain and no valid mitigating circumstances exist. "Striking one aggravating factor when there are no mitigating circumstances does not necessarily require resentencing because, '[i]f there is no likelihood of a different sentence, the error must be deemed harmless.'" Sochor v. State, 619 So.2d 285, 293 (Fla. 1993) (quoting Rogers v. State, 511 So.2d 526, 535 (Fla. 1987)). Under the circumstances of this case, we find that there is no likelihood of a different sentence even if the CCP aggravator had been eliminated from the trial court's consideration. Thus, the trial court's reliance on the unsupported aggravator was harmless error.[51]   See Bruno v. Moore, 838 So.2d 485 (Fla. 2002);

---

[51] "While federal law does not require the state appellate court to remand for resentencing, it must, short of remand, either itself reweigh without the invalid aggravating factor or determine that weighing the invalid factor was harmless error." Sochor, 504 U.S. at 532. Here, the Florida Supreme Court conducted the requisite harmless error analysis.

Sochor, 619 So.2d at 293.  We therefore deny relief on this claim.

Wright, 857 So.2d at 878-79 (footnotes omitted).

Upon a thorough review of the record and the applicable law, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Petitioner is not entitled to relief on this claim.

## I. Ground Nine

Petitioner contends that the trial court violated the Sixth and Fourteenth Amendments to the United States Constitution by restricting Petitioner's right to cross-examine the following witnesses: (1) Dr. William Latimer, the medical examiner, Amended Petition at 133-34[52]; (2)  Kenneth Goodson, id. at 134-35[53]; (3) Officer Perkins, id. at 135-36[54]; and (4) Charles Westberry.  Id. at 136-39.[55]  Petitioner raised this issue on direct appeal, see Ex. B at 10-16, and the Florida Supreme Court rejected it without discussion.[56]  See Wright, 473

---

[52] The portions of the transcript cited on these pages are located in Ex. A-12.

[53] The portions of the transcript cited on these pages are located in Ex. A-12.

[54] The portions of the transcript cited on these pages are located in Ex. A-3 and Ex. A-15.

[55] The portions of the transcript cited on these pages are located in Ex. A-15.

[56] Petitioner also argued in ground seven of his first 3.850 motion that the trial court unconstitutionally restricted his cross-examination of Charles Westberry because defense counsel was unable to fully cross-examine Westberry concerning his involvement with the Petitioner in dealing in scrap metal.  The trial court found that the claim "should have been raised on direct appeal."  Ex. G-6 at 1088.  The Florida Supreme Court upheld this

So.2d at 1279 ("We reject each of appellant's contentions and find only the issues relating to the exclusion of Waters' testimony and the admissibility of the Williams rule evidence merit discussion.").

 Upon a thorough review of the record and the applicable law, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law,[57] did not involve an unreasonable application of clearly established federal law, and was

procedural bar, finding "that the trial court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion." Wright, 581 So.2d at 886.  However, this ground is not procedurally barred from federal habeas review since it was also raised on direct appeal. See Ex. B at 14-16.

[57]  Under the Sixth Amendment, a criminal defendant has the right to confront his accusers, which includes the right to effective cross-examination.  Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Effective cross-examination, in turn, requires that the defendant be able to expose a witness's biases and motives to lie.  Id. at 678–79, 106 S.Ct. at 1435.  Generally stated, trial courts must allow questioning on an issue if, after hearing the proposed testimony, "[a] reasonable jury might have received a significantly different impression" of the witness's credibility.  Id. at 680, 106 S.Ct. at 1436.

 At the same time, trial courts retain discretion to limit cross-examination to protect against factors such as "'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'"  Olden v. Kentucky, 488 U.S. 227, 232, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (per curiam) (quoting Van Arsdall, 475 U.S. at 679, 106 S.Ct. at 1435).

Childers v. Floyd, 642 F.3d at 970.  Here, the trial court either properly excluded the proposed testimony or the excluded testimony would not have caused a reasonable jury to have received a significantly different impression of the witness's credibility.

not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Petitioner is not entitled to relief on this claim.[58]

## J. Ground Ten

Petitioner contends the trial court violated his right to remain silent under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution by permitting Officer Perkins to testify that Petitioner made the following inculpatory statement: "If I confess to this, I will die in the electric chair. If I don't talk I stand a chance of living."[59] Amended Petition at 140-43. Petitioner raised this issue on direct appeal, see Ex. B at 27-32, and the Florida Supreme Court rejected it without discussion. See Wright, 473 So.2d at 1279 ("We reject each of appellant's contentions and find only the issues relating to the exclusion of Waters' testimony and the admissibility of the Williams rule evidence merit discussion.").

Petitioner also raised this claim in his first 3.850 motion, and the trial court adjudicated it as follows:

> Claim VI alleging Miranda[[60]] violations should have been raised on direct appeal. In his claim, the Defendant alleges that allowing the deputy sheriff to testify to the statement that, "If I confess to this, I'll die in the electric chair. If I don't talk I stand a chance of living," allegedly made by the Defendant after being advised of his Miranda rights was in violation of his Fifth Amendment Right to Silence. The statement was clearly

---

[58] The Court also finds these claims to be without merit for the reasons set forth in the State's Answer Brief of Appellee on direct appeal. See Ex. C at 1-15.

[59] See Ex. A-15 at 2351.

[60] Miranda v. Arizona, 384 U.S. 436 (1966).

> voluntary as the Defendant had just been advised of his <u>Miranda</u> rights.  Even accepting that the statement was taken in violation of <u>Miranda</u>, the Supreme Court of Florida has held that allowing such statements to be admitted at trial was harmless error, when, as in the instant case, the improper statement was not the primary evidence linking the Defendant to the crime, but rather cumulative to the evidence presented by the key witness. <u>Alvord v. Dugger</u>, No. 71,192 [541 So.2d 598] (Fla. May 11, 1989).  Therefore, even if the Defendant's allegation of a Fifth Amendment violation is taken as true, the Defendant's claim is insufficient to merit relief.

Ex. G-6 at 1088.  Upon Petitioner's appeal, the Florida Supreme Court found "that the trial court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion." <u>Wright</u>, 581 So.2d at 886.

Upon a thorough review of the record and the applicable law, this Court concludes that the state court's adjudications of this claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Petitioner is not entitled to relief on this claim.

## VII. Certificate of Appealability

This Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'"

Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Id.

Upon consideration of the record as a whole, this Court will grant a certificate of appealability with respect to grounds one, two and eight of the Amended Petition.  The Court will deny a certificate of appealability with respect to the remaining claims.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.     Petitioner's Motion to Interview Jurors (Doc. #28) is **DENIED**.

2.     The Amended Petition (Doc. #15) is **DENIED**.

3.     This action is **DISMISSED WITH PREJUDICE**.

4.     The Clerk of the Court shall enter judgment denying the Amended Petition and dismissing this case with prejudice.

5.      If Petitioner appeals the denial of the Amended Petition, the Court grants a

certificate of appealability with respect to grounds one, two and eight of the Amended

Petition.  The Court denies a certificate of appealability with respect to the remaining claims.

6.      If Petitioner appeals the denial of the Amended Petition, Petitioner is entitled

to appeal as a pauper.

7.      The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 19th day of March, 2013.


_____
TIMOTHY J. CORRIGAN
United States District Judge


ps
c:
Counsel of Record